In re ZYPREXA PRODUCTS LIABILITY LITIGATION.

Arlene Earl, as Administrator of the Estate of Kefrey D. Earl, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Nos. 04–MD–1596, 07–CV–3912.

United States District Court, E.D. New York.

Aug. 28, 2009.

Michael D. Ermert, Hare, Wynn, Newell & Newman, LLP, Birmingham, AL, for Plaintiff.

Alan Daniel Mathis, James C. Barton, Jr., Johnston Barton Proctor & Powell, LLP, Birmingham, AL, Andrew R. Rogoff, Matthew J. Hamilton, Nina M. Gussack, Pepper Hamilton LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM & ORDER DENYING SUMMARY JUDGMENT

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I. Introduction ...................................................132

II. History of Zyprexa Litigation ...........................................132

III. Facts .........................................................136
  A. Contents and Use of Zyprexa .........................................136
  B. Labeling and Warnings to Patients and Medical Professionals................136
    1. FDA Labeling and "Dear Doctor Letter" .............................136
    2. Consensus Statement of American Diabetes Association and Other Learned Groups .........................................137
    3. FDA March 2007 Letter .........................................138
    4. Findings on Medical Community's Knowledge of Zyprexa's Risks .........139
  C. Kefrey D. Earl and Treating Physicians' Decision to Prescribe Zyprexa.....140
    1. Earl's Psychiatric and Medical History ...............................140
    2. Prescribing Physicians' Knowledge of Zyprexa's Risks of Metabolic Side Effects ...................................................141
    3. Proposed Expert Testimony of Dr. David S.H. Bell ....................144

IV. Law .........................................................144
  A. Expert Witness Qualification Requirements ..............................144
  B. Summary Judgment Standard ...........................................146
  C. Choice of Law .......................................................146
  D. Alabama State Law ..................................................146

V. Application of Law to Facts ............................................. 147
    A. Motion to Exclude Proffered Expert ................................... 147
    B. Proximate Causation .................................................. 148
    C. Motion to Remand ..................................................... 149

VI. Conclusion ............................................................. 150

Appendix A   Curriculum Vitae, Dr. David S.H. Bell

Appendix B   Dr. David S.H. Bell Expert Report

## I. Introduction

Defendant Eli Lilly & Company (hereinafter "Lilly") moves for summary judgment against plaintiff Arlene Earl, the administrator of the estate of Kefrey D. Earl (the latter hereinafter "Earl"). Plaintiff commenced this action in the Alabama Circuit Court of Jefferson County on July 12, 2007. The case was removed to the United States District Court for the Northern District of Alabama and then transferred to the Eastern District of New York pursuant to an order of the Judicial Panel on Multidistrict Litigation.

The present action is essentially a negligence claim, based on an alleged failure to warn, rather than a fraud or warranty claim demanding reimbursement for money spent for Zyprexa. It is alleged by plaintiff that: (1) Zyprexa, a drug produced by Lilly, caused Earl's diabetes; (2) Lilly failed to warn of the dangers of Zyprexa; and (3) Zyprexa would not have been prescribed or a different course of treatment would have been taken, and diabetes would not have been suffered, had proper warnings been given.

Lilly seeks the exclusion of plaintiff's proposed expert witness, Dr. David S.H. Bell, because (1) his conclusion is impermissible *ipse dixit;* (2) his opinion on Zyprexa's causative relationship to diabetes lacks a reliable basis of generally accepted scientific principles and methodology; and (3) he fails to account for alternative causes of Earl's injuries.

Lilly also moves for summary judgment, contending that by operation of the learned intermediary doctrine, there is no causal connection between any inadequacy in Lilly's warnings and the decision to prescribe Zyprexa to Earl.

Plaintiff opposes Lilly's motions and requests that the court advise the Judicial Panel on Multidistrict Litigation that a remand of this action is appropriate.

For the reasons indicated below, defendant's motion to exclude plaintiff's expert and motion for summary judgment are denied. Plaintiff's motion for remand is denied as premature; a renewed request may be submitted at the completion of all discovery and motion practice.

## II. History of Zyprexa Litigation

This massive and highly complex multidistrict litigation has included claims brought by individual Zyprexa users, states, third-party payors, and other entities alleging physical or financial injury. Some 30,000 cases have been brought against Lilly by individual plaintiffs suffering from serious psychiatric problems who were treated with the Lilly antipsychotic drug Zyprexa. They principally allege that Zyprexa caused deleterious side effects of excessive weight gain, hyperglycemia, and diabetes; that Lilly misled them and their physicians about the likelihood of these side effects; and that, had they or their attending physicians been aware of

the risks, they would not have taken Zyprexa.

Litigation against Lilly for injuries allegedly caused by Zyprexa was initiated in this court in March 2004. *See Benjamin v. Eli Lilly & Co.*, No. 04–CV–893. Thousands of cases were then transferred here from federal district courts throughout the United States pursuant to an order of the Judicial Panel on Multidistrict Litigation. *See* Letter from Multidistrict Litigation Panel to Clerk of the Eastern District of New York, No. 04–MD–1596, Docket Entry No. 1, Apr. 14, 2004. Similar cases have been litigated in state courts. *See In re Zyprexa Prods. Liab. Litig.*, 239 F.R.D. 316 (E.D.N.Y.2007) ("Memorandum on Cooperation Between Federal and State Judges").

The individual Zyprexa user litigation has been administered as a quasi-class action. *See In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d 256, 262 (E.D.N.Y. 2006) ("The court, magistrate judge and special masters will continue to administer this litigation as a quasi-class action."); *In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458, 477 (E.D.N.Y.2006) ("Recognizing its obligation to exercise careful oversight of this national 'quasi-class action,' the court has already utilized its equitable power to limit attorneys' fees and costs.") (citation omitted); *In re Zyprexa Prods. Liab. Litig.*, 433 F.Supp.2d 268, 271 (E.D.N.Y.2006) (finding that individual Zyprexa user litigation "may be characterized properly as a quasi-class action subject to the general equitable power of the court"); *In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 491 (E.D.N.Y. 2006) (same); *In re Zyprexa Prods. Liab. Litig.*, 233 F.R.D. 122, 122 (E.D.N.Y.2006) (same).

Cooperation between federal and state courts has been encouraged at all stages of the *Zyprexa* litigation. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d at 262 ("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prod. Liab. Litig.*, No. 04–MD–1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 16, 2006) ("Coordination and cooperation between state and federal courts has been encouraged."); *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 197151 (E.D.N.Y. Jan. 30, 2006) (letter to state judges with Zyprexa cases suggesting coordination and cooperation); *In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2004 WL 3520248, at *4 (E.D.N.Y. Aug. 18, 2004) (directing defendant Lilly and Plaintiffs' Steering Committee I to "confer regarding procedures for coordination of state court discovery with discovery in this MDL").

A national system for resolving Medicare and Medicaid liens was approved. *See In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458 (E.D.N.Y.2006). All states and the federal government agreed to modify their lien demands to provide a national equitable system. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 3501263, at *1 (E.D.N.Y. Dec. 4, 2006) ("In compliance with this court's instructions ... all fifty states as well as the federal government have resolved their Medicare and Medicaid liens.") (citation omitted).

On April 16, 2004, a class action was filed on behalf of individuals claiming personal injury based on, among other claims, Lilly's failure to provide an adequate warning about the risks of Zyprexa. *See Ortiz v. Eli Lilly & Company*, No. 04–CV–1587 (E.D.N.Y.). A second and substantially similar class action was filed in this court on May 19, 2004. *See Tringali v. Eli Lilly & Company*, No. 04–CV–2104 (E.D.N.Y.). On September 15, 2004, Lilly and plaintiffs' counsel in the two putative class actions entered into an agreement to

execute stipulations of dismissal of the class actions, with the effective date of dismissal to be November 1, 2004, or 167 days after the *Ortiz* action was filed. *See* Joint Memorandum of the Parties Regarding Stipulation of Voluntary Dismissal of Certain Claims, No. 04–MD–1596, Docket Entry No. 80, Attach. 2.

Discovery and negotiations were overseen in part by a court-appointed special discovery master and four special settlement masters. In November 2005, Lilly, without conceding liability, entered into a settlement covering some 8,000 individual plaintiffs. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2005 WL 3117302 (E.D.N.Y. Nov. 22, 2005). The settlement resolved virtually all cases then pending in the MDL, along with some state cases. *See id.*

An attorneys' fee structure for many cases was ordered, capping fees at 20% of recovery in smaller, lump-sum claims, and at 35% of recovery in other claims. *See In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488 (E.D.N.Y.2006). Costs related to the individual cases and charged to individual settling plaintiffs were limited. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2006 WL 2443248 (E.D.N.Y. Aug. 24, 2006). Counsel for some 2,000 individual plaintiffs filed an appeal of an order capping fees, *see In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2007 WL 2340789 (E.D.N.Y. Aug. 17, 2007), which is now pending before the Court of Appeals for the Second Circuit. The magistrate judge allocated funds from a first common benefit fund after reviewing the first Plaintiffs' Steering Committee's ("PSC I") applications. *See In re Zyprexa Prods. Liab. Litig.*, No. 04–MD–1596, 2007 WL 805793 (E.D.N.Y. Mar. 15, 2007). Allocation of funds has been substantially completed for PSC I.

Following an influx of thousands of new cases, in January 2007 the parties announced another round of settlements, which are nearing completion. A second common benefit fund was established to compensate members of a second PSC for their work. *See In re Zyprexa Prods. Liab. Litig.*, 467 F.Supp.2d at 262.

Four motions for summary judgment by Lilly in individual *Zyprexa* cases were decided in June 2007. Three of those motions were denied and one was granted based on application of the statute of limitations, which barred that plaintiff's claim. *See Souther, et al. v. Eli Lilly & Co.*, 489 F.Supp.2d 230 (E.D.N.Y.2007).

A class action has been brought on behalf of third-party payor institutional plaintiffs that include pension funds, labor unions, and insurance companies that cover their members' health benefits; they have covered payments for Zyprexa prescriptions. Mail fraud under the Racketeer Influenced and Corrupt Organizations Act ("RICO") is alleged, *see* 18 U.S.C. § 1964, predicated on overpricing supported by excessive claims of utility as well as disavowal of adverse secondary effects of the drug, primarily weight gain and diabetes. That class has been certified. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 201 (E.D.N.Y.2008). Individual plaintiffs who bought, or paid a portion of the purchase price for, Zyprexa for their own use also sought class action status on a similar theory. Certification of this individual payor class action was denied. *See id.* at 201–02.

Many state attorneys general have sued on behalf of their states' citizens seeking reimbursement for overpayments for Zyprexa made with state and federal funds via state Medicaid programs and other remedies based upon state law grounds. Currently pending in this court are actions on behalf of the citizens of nine states. A

putative *qui tam* action by a whistleblower representing California was dismissed. Order, *California ex rel. Jaydeen Vincente v. Eli Lilly & Co.,* Apr. 23, 2008, No. 08–CV–600, Docket Entry No. 84. The case originating in this district, brought by the state of Connecticut, will be tried in November 2009 if it has not been settled or dismissed before that date. *See* Order, Apr. 21, 2009, No. 08–CV–955, Docket Entry No. 205. Motions for summary judgment in other state attorney general cases before this court will be heard in fall 2009. *See* Case Management Order No. 6, No. 04–MD–1596, Docket Entry No. 2092, Mar. 13, 2009.

In March 2008, Lilly reportedly settled with the state of Alaska during trial in a related case. *See* Alex Berenson, *Alaska Suit Against Lilly Is Settled,* N.Y. Times, Mar. 26, 2008, at C1 (reporting the settlement agreement reached after three weeks of trial before the case went to the jury). That state's lawsuit sought reimbursement for the medical costs of Alaska Medicaid patients who developed diabetes while taking Zyprexa; the state's claim to recover costs associated with Lilly's off-label promotion of Zyprexa was dismissed before trial. *See* Alex Berenson, *Lilly Executive Discussed Off–Label Uses for Drug,* N.Y. Times, Mar. 15, 2008, at C1. Some of the materials introduced in that trial are available as part of the public record. Other *Zyprexa* settlements have followed. *See* Alex Berenson, *33 States to Get $62 Million in Zyprexa Case Settlement,* N.Y. Times, Oct. 7, 2008, at B7.

Some of Lilly's shareholders have filed suit because of the decline in share price. *See In re Eli Lilly & Co. Securities Litig.,* No. 07–CV–1310 (E.D.N.Y.). This litigation has been dismissed on statute of limitations grounds. *See In re Zyprexa Prods. Liab. Litig.,* 549 F.Supp.2d 496 (E.D.N.Y.2008).

Current shareholders have sued in this court in the form of three separate shareholder derivative actions. *See Waldman v. Taurel,* No. 08–CV–560 (E.D.N.Y.); *City of Taylor Employees Retirement System v. Taurel,* No. 08–CV–1554 (E.D.N.Y.); *Robins v. Taurel,* No. 08–CV–1471 (E.D.N.Y.). Similar cases are pending in other courts. Settlement negotiations are ongoing.

Additional cases transferred to the multidistrict litigation are being managed by a special master, who is tracking settlements, setting timelines for discovery and the adjudication of dispositive motions, and scheduling trial dates. *See* Case Management Order No. 32, 04–MD–1596, Docket Entry No. 2072, Mar. 3, 2009. Several cases originally set for trial have been settled or withdrawn. Individual actions originating in the Eastern District of New York have been placed on an expedited discovery and motion schedule so that trial on those actions may, if necessary, move forward without undue delay.

A number of summary judgment motions by Lilly in individual Zyprexa user actions have been decided or remain pending. The court has ruled on various *Daubert* motions challenging proposed expert testimony in these and other cases. *See, e.g., In re Zyprexa Prods. Liab. Litig.,* 04–MD–1596, 2009 WL 1357236 (E.D.N.Y. May 12, 2009) (ordering the exclusion of plaintiffs' proposed expert testimony in twenty cases); *see In re Zyprexa Prods. Liab. Litig.,* 04–MD–1596, 2009 WL 1322286, (E.D.N.Y. May 12, 2009) (approving plaintiffs' proposed expert testimony in two cases); *In re Zyprexa Prods. Liab. Litig.,* 04–MD–1596, 2009 WL 1322292 (E.D.N.Y. May 12, 2009) (approving defendant's proposed expert testimony); *Souther,* 489 F.Supp.2d at 281–91 (denying plaintiffs' and defendant's *Daubert* motions to exclude expert testimony).

## III. Facts

### A. *Contents and Use of Zyprexa*

Zyprexa's active ingredient is olanzapine, one of a class of medications known as "atypical" or "second generation" antipsychotics. It was approved for use in treating schizophrenia and acute manic episodes associated with bipolar disorder by the United States Food and Drug Administration ("FDA") in 1996. In 2004, the FDA also approved Zyprexa for the treatment of bipolar disorder generally.

### B. *Labeling and Warnings to Patients and Medical Professionals*

#### 1. *FDA Labeling and "Dear Doctor Letter"*

The 1996 Zyprexa package insert accompanying the drug disclosed information about possible side effects of administration of olanzapine based on clinical trials. The insert provided, in part, the following information:

*Adverse Events Occurring at an Incidence of 1% or More Among Olanzapine–Treated Patients in Short–Term, Placebo–Controlled Trials*—Table 1 enumerates the incidence, rounded to the nearest percent, of treatment-emergent adverse events that occurred during acute therapy (up to 6 weeks) of schizophrenia in 1% or more of patients treated with olanzapine (doses ≥ 2.5 mg./day) where the incidence in patients treated with olanzapine as greater than the incidence in placebo-treated patients.

The prescriber should be aware that the figures in the tables and tabulations cannot be used to predict the incidence of side effects in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators. The cited figures, however, do provide the prescribing physician with some basis for estimating the relative contribution of drug and nondrug factors to the side effect incidence in the population studies.

Zyprexa Package Insert, dated October 1, 1996, at 11 (emphasis in original).

Two tables in the insert provided the results of placebo-controlled clinical studies of olanzapine-treated patients. The data indicates that, over a six-week administration of Zyprexa, six percent of olanzapine-treated patients reported weight gain, while only one percent of the placebo-treated patients reported weight gain. *Id.* at 12–16.

For several years, this information on the insert remained substantially the same insofar as it provided physicians information on reported weight gain-related adverse events. During this period, the results of longer-term studies and clinical experience with Zyprexa and competing drugs became widely known. *See* Part III.B.4, *infra.*

In May 2000, the FDA undertook an analysis of the incidence of diabetes and hyperglycemia in patients using atypical antipsychotics. The director of the FDA's Division of Neuropharmalogical Drug Products ("DNDP") requested additional safety information about Zyprexa from Lilly. In its letter, the FDA cited post-marketing reports of diabetes-related adverse events associated with Zyprexa use. In response, Lilly provided the FDA with clinical studies, data analysis, and case report reviews. The parties disagree about whether the information given by Lilly to the FDA was complete and accurate.

On September 11, 2003, the FDA announced it would require a warning about

risks of hyperglycemia and diabetes mellitus and treating precautions to appear in the package insert of all atypical antipsychotics, including Zyprexa. Designed for prescribing doctors, the label noted that epidemiological studies and other information indicated that the relationship between the drug and hyperglycemia and diabetes was not yet fully understood. It reads as follows:

WARNINGS

Hyperglycemia and Diabetes Mellitus

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hypersomolar coma or death has been reported in patients treated with atypical antipsychotics including Zyprexa. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiological studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . .

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at the beginning of treatment and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia including polydipsia, polyuria, polyphagia, and weakness. Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. . . .

The label did not mention weight gain or diabetes in the "warning to patients" section.

Lilly added the FDA-required language to the Zyprexa label on September 16, 2003. It issued a press release announcing the label change on September 17, 2003. At the FDA's request, on March 1, 2004, Lilly sent a "Dear Doctor" letter to physicians in the United States informing them of the 2003 label change.

### 2. Consensus Statement of American Diabetes Association and Other Learned Groups

In November 2003, the American Diabetes Association, American Psychiatric Association, American College of Clinical Endocrinologists, and the North American Association for the Study of Obesity convened a consensus development conference (the "ADA consensus conference") on the subject of the association between antipsychotic drugs and diabetes. An eight-member panel heard presentations from fourteen experts drawn from the fields of psychiatry, obesity, and diabetes; FDA representatives; and atypical antipsychotic drug manufacturers. The panel reviewed most of the relevant peer-reviewed English language scientific articles.

The ADA consensus conference concluded that Zyprexa and Clozaril posed an increased risk of diabetes as compared to other atypical antipsychotic drugs. The consensus statement produced by the con-

ference declared that these relative risks as well as advantages of the individual drugs for individual patients in a heterogeneous population "should ... influence drug choice." In part, its report concluded:

> There is considerable evidence, particularly in patients with schizophrenia, that treatment with [atypical antipsychotics] can cause a rapid increase in body weight in the first few months of therapy that may not reach a plateau even after 1 year of treatment. There is, however, considerable variability in weight gain among the various [atypical antipsychotics]. . . .
>
> \* \* \*
>
> Clozapine [Clozaril] and olanzapine [Zyprexa] ... produce the greatest weight gain.
>
> · \* \* \*
>
> Despite limitations in study design, the data consistently show an increased risk for diabetes in patients treated with clozapine [Clozaril] or olanzapine [Zyprexa] compared with patients not receiving treatment with [first generation antipsychotics] or with other [atypical antipsychotics]. The risk in patients taking risperidone and quetiapine is less clear; some studies show an increased risk for diabetes, while others do not. The two most recently approved [atypical antipsychotics], aripiprazole and ziprasidone, have relatively limited epidemiological data, but available clinical trial experience with these drugs has not shown an increased risk for diabetes.
>
> \* \* \*
>
> [T]he risks of obesity, diabetes, and dyslipidemia have considerable clinical implications in this patient population and should ... influence drug choice. Even for those medications associated with an increased risk of metabolic side effects, the benefit to specific patients could outweigh the potential risks. For example, clozapine [Clozaril] has unique

benefits for treatment-refractory patients and those at significant risk for suicidal behavior. Since treatment response in many psychiatric conditions is heterogeneous and unpredictable, physicians and patients can benefit from the availability of a broad array of different therapeutic agents.

> \* \* \*
>
> These three adverse conditions [obesity, diabetes, and dyslipidemia] are closely linked, and their prevalence appears to differ depending on the [atypical antipsychotic] used. Clozapine [Clozaril] and olanzapine [Zyprexa] are associated with the greatest weight gain and highest occurrence of diabetes and dyslipidemia. Risperidone and quetiapine appear to have intermediate effects. Aripiprazole and ziprasidone are associated with little or no significant weight gain, diabetes, or dyslipidemia, although they have not been used as extensively as other agents.
>
> The choice of [atypical antipsychotic] for a specific patient depends on many factors. The likelihood of developing severe metabolic disease should also be an important consideration.

American Diabetes Association et al., Consensus Development Conference on Antipsychotic Drugs and Obesity and Diabetes, 27 Diabetes Care 596, 596–97 (Feb. 2004).

### 3. FDA March 2007 Letter

On March 27, 2007, the FDA raised concerns about the adequacy of Zyprexa's warning label in a letter to Lilly.

> [W]e are concerned that the labeling is deficient with regard to information about weight gain, hyperglycemia, and hyperlipidemia that is associated with olanzapine [Zyprexa] use. . . .

Our overall goal is to improve labeling with regard to these findings so that clinicians will be better informed on what the risks are for their patients. They cannot make reasonable treatment decisions until they have such information. We do not feel that current labeling for ... Zyprexa

provides sufficient information on these risks, and we fully intend to insure that ... labels are enhanced with the best available information to characterize these risks.

*In re Zyprexa Prods. Liab. Litg.*, 253 F.R.D. at 141 (quoting Letter from Thomas Laughren, FDA, to Robin Pitts Wojcieszek, Eli Lilly & Co., Mar. 27, 2007).

### 4. Findings on Medical Community's Knowledge of Zyprexa's Risks

A universally applicable date from which the statute of limitations is to be considered to run on an individual Zyprexa user's claim has not been determined. Numerous events represent moments at which a patient, health care provider, institution, or the medical community at large arguably discovered that the cause of an alleged injury may have been the administration of Zyprexa. The evidence in this mass litigation, including medical records and the depositions of numerous doctors, suggests that it was widely known and understood in the late 1990s among treating and prescribing physicians that weight gain may follow the administration of Zyprexa. The association between weight gain and heightened risks of diabetes was also broadly recognized by that time.

Formal events include the September 2003 Zyprexa label change and contemporaneous press release, the 2003 consensus statement of the American Diabetes Association, and the March 2004 "Dear Doctor" letter distributed nationwide to physicians by Lilly.

In its June 2007 memorandum, order, and judgment on four motions for summary judgment, this court found that, for purposes of those motions, the March 2004 "Dear Doctor" letter would be considered the latest possible date on which members of the medical community knew or should have known about Zyprexa's obesity- and diabetes-related risks to patient health. *See Souther*, 489 F.Supp.2d at 278. In *Souther*, applying the relevant "learned intermediary" doctrine, it was determined that Souther's claim was barred by the statute of limitations:

Diabetes developed and Zyprexa was prescribed [to plaintiff Cusella] years before the September 2003 label change. *At least from the date of March 2004 Dear Doctor letter, the causal connection between Zyprexa and diabetes was known to Dr. Ganime, Cusella's treating physician.* Since Lilly's duty to warn ran to Dr. Gamine rather than Cusella, it became Dr. Ganime's duty from that point onwards to disclose to Cusella that Zyprexa might exacerbate his diabetes, and that it may have been the impetus behind Cusella's insulin-dependancy in the first place.

Dr. Ganime's medical records and deposition testimony ... show that Cusella was warned numerous times about the link between Zyprexa and diabetes. While the pre-label change warnings Dr. Ganime received from Lilly *may* not have been adequate to absolve Lilly of liability to Cusella, those warnings Cusella received from Dr. Ganime following the label change placed him on notice that use of Zyprexa might have worsened his diabetes and caused him to become insulin-dependent.

*Measured either against the date Cusella developed diabetes—August 1999—or the latest possible date Dr. Gamine was aware of the potential causal connection between Zyprexa and diabetes—March 2004*—Pennsylvania's two year statute of limitations had run on Cusella's claim before he filed this suit in April of 2006.

*Id.* (emphasis added; citations to record omitted).

The March 1, 2004 date represents the "latest possible date" prescribing physicians and, in effect, their patients are deemed aware of the potential causal connection between Zyprexa and diabetes and from which the statute of limitations may

run as to any individual plaintiff. Nevertheless, a fact-specific analysis is necessary for each case to determine when the plaintiff—whether independently or by operation of the learned intermediary doctrine—knew the potential causal connection between Zyprexa and adverse health effects. The facts in many individual cases indicate a much earlier date of discovery for purposes of the statute of limitations. *See, e.g.*, Appendices A–D of *Souther*, 489 F.Supp.2d 230 (including relevant depositions demonstrating doctors' awareness of Zyprexa's association with patient weight gain).

## C. *Kefrey D. Earl and Treating Physicians' Decision to Prescribe Zyprexa*

### 1. *Earl's Psychiatric and Medical History*

Kefrey D. Earl had a long history of paranoid schizophrenia and depression. Medical records show that in December 1996, he manifested schizophrenic behavior. Def. Statement of Undisputed Material Facts (hereinafter "Def. SUF"), Ex. 5, at EARL_0016–17, 0025–30. On February 19, 1997, he was involuntarily committed to the University of Alabama at Birmingham (hereinafter "UAB") Hospital for "onset of acute psychosis." *Id.* Diagnosed with paranoid schizophrenia, he was prescribed Ativan, Zyprexa, and other psychiatric drugs shortly following admission. *Id.,* Ex. 5, at EARL_0018, 0049–50, 0085–86. A laboratory test administered during this hospitalization indicated a blood glucose level of 104 milligrams per deciliter, which is within the normal range. *Id.*, Ex. 5, at EARL_0021–22.

Dr. Ernest L. Park, Earl's treating physician at this time, observed that the medications helped to "minimize delusional thinking" and improve sleeping patterns. *Id.,* Ex. 5, at EARL_0019–20. Dr. Park reported that Earl was "psychiatrically stable with no suicidal or homicidal ideations." *Id.* On March 5, 1997, Earl was identified as obese, weighing 183 pounds, based on an estimated ideal body weight of 142–154 pounds. *Id.*, Ex. 5, at EARL_0397. On March 20, 1997, Zyprexa treatment was discontinued after the psychotic features suffered by Earl had substantially decreased. *Id.,* Ex. 5, at EARL_0521, 0568, 0570; Ex. 3, at 89–91, 94–95.

On February 10, 1998, Earl was again involuntarily committed to UAB Hospital for "acute exacerbation of paranoid schizophrenia." *Id.,* Ex. 5, at EARL_0128–30. Earl's treating physician, Dr. Cesar E. Munoz, prescribed Zyprexa and Haldol in an effort to treat his psychiatric symptoms. *Id.,* Ex. 5, at EARL_0128–30, 0152. On February 23, 1998, Earl was transferred to Bryce Hospital for further treatment, receiving an admission diagnosis of "Schizophrenia, Paranoid, Unspecified Type." *Id.,* Ex. 5, at EARL_0604–08, 0642–45, 0653–58. He was then prescribed ten milligrams of Zyprexa per day until his discharge on April 7, 1998. *Id.* Zyprexa treatment was maintained following discharge. *Id.*

Dr. Timothy Stone began treating Earl at Eastside Mental Health Center in May 1998, noting that Earl appeared to be "doing well" on Zyprexa treatment. *Id.,* Ex. 4, at 59. An extended period of noncompliance with the prescribed regimen followed; Earl's condition regressed significantly, leading to an arrest and further psychiatric evaluations and hospitalization in February 1999. *Id.,* Ex. 5, at EARL_0241–43. At UAB Hospital, Dr. Munoz prescribed Haldol, which caused several side effects, including drowsiness and lack of energy, motivation, and concentration. *Id.,* Ex. 5, at EARL_0929–32, 0994. Earl was discharged on February 15, 1999, approximately two weeks follow-

ing admission. *Id.*, Ex. 5, at EARL_0241. Around that time, it was documented that Earl weighed 171 pounds. Pl. Resp. Mot. Summ. J., Ex. 3, at 1.

In April 1999, Earl's Haldol dosage was decreased and Risperdal was initiated. Def. SUF, Ex. 5, at EARL_0930, 0994. Dr. Stone noted Earl's request that he be restarted on a treatment regimen that included Zyprexa. *Id.* In June 1999, Zyprexa was prescribed to Earl by Dr. Stone. *Id.*, Ex. 4, at 74–75; Ex. 5, at EARL_0925, 0992; Ex. 7, at EARLK_SD_0038. Records indicate that Earl remained on 7.5 milligrams of Zyprexa per day from 1999 until his death on July 26, 2005. *See, e.g., id.*, Ex. 8, at EARLK_EMH_0011.

During this extended period of Zyprexa treatment, Earl gained a substantial amount of weight. In June 2003, his documented weight was 226 pounds. *Id.*, Ex. 5, at EARL_0079–80. In March 2005, he weighed some 251 pounds, a considerable increase from the 171 pounds he weighed in February 1999. *Id.*, Ex. 5, at EARL_0873.

Laboratory tests administered on March 23, 2005 revealed an elevated fasting blood glucose level of 163 milligrams per deciliter, suggesting possible diabetes onset but not warranting a formal diagnosis. *Id.*, Ex. 4, at 100–01; Ex. 5, at EARL_0870. Dr. Stone and others expressed concern about the relationship between Earl's Zyprexa use, weight gain and other metabolic problems, including a potential diabetes diagnosis. *Id.*, Ex. 4, at 100–01. Earl failed to appear at a number of scheduled appointments for further testing. *Id.*, Ex. 5, at EARL_1011, 0857; Ex. 8, at EARLK_EMH_0028. On July 26, 2005, Earl was found dead in his home; his measured blood glucose level was 1,150 milligrams per deciliter, which is substantially elevated. *Id.*, Ex. 5, at EARL_1053–58. The documented cause of death was

"Diabetic Ketoacidosis." *Id.*, Ex. 5, at EARL_1063.

### 2. Prescribing Physicians' Knowledge of Zyprexa's Risks of Metabolic Side Effects

There is no evidence in the record as to whether or not Zyprexa's metabolic side effects were known to any of Earl's prescribing physicians or other health care providers prior to Dr. Stone. Evidence on the state of knowledge of Dr. Stone, Earl's primary prescribing physician from May 1998 until July 2005, is available.

Dr. Stone is a board-certified psychiatrist who has practiced in a variety of settings since receiving his medical degree from the University of Alabama at Birmingham in 1990. *Id.*, Ex. 4, at 14–17, 20–21. He has treated patients with a spectrum of mental health problems, including schizophrenia, schizoaffective disorder, bipolar disorder, depression, anxiety disorders, and personality disorders. *Id.*, Ex. 4, at 25–26. He has prescribed second-generation antipsychotic drugs since 1990, when he treated patients with Clozapine. *Id.*, Ex. 4, at 28–29. He started to prescribe Zyprexa to patients when the drug was released in the mid–1990s. *Id.*, Ex. 4, at 29.

Dr. Stone first prescribed Zyprexa to Earl on May 13, 1998, continuing the treatment regimen that had been utilized during a then recent hospitalization. He described his decision to maintain Zyprexa treatment:

Q: [W]hat was the reason that you continued the Zyprexa at that time?

A (Dr. Stone): ... [I]n general, we try to be consistent with what the patient has been stabilized on in the hospital. You don't want to have someone come out and just try to make broad sweeping changes in medications and diagnosis for

somebody who's stable because you don't really—you don't know the person.

Q: And was the Zyprexa effective for Mr. Earl at that time?

A: ... [I]t was. He was sleeping well, eating well, denied auditory or visual hallucinations, denied feeling paranoid. When I talked to him, his thought processes were organized. I couldn't elicit any evidence of psychosis at the time. And he seemed to be doing well. In fact, he wanted to go back to work.

*Id.,* Ex. 4, at 58–59.

Dr. Stone continued to treat Earl with Zyprexa until Earl's death on July 26, 2005. *Id.,* Ex. 4, at 97, 104. He met with Earl regularly during the several years that Earl was his patient. Discussions about Zyprexa's effectiveness and other health matters were common. On September 8, 1999, Dr. Stone noted that Earl "feels the medication keeps him from having hallucinations. He denies side effects. He says he likes his medication." *Id.,* Ex. 4, at 77. Noted was some weight gain, precipitating a discussion on the importance of physical activity to maintain good health. *Id.,* Ex. 4, at 77–78. Dr. Stone recalled that he inquired about the weight gain at this time in part because he considered it a possible side effect of Zyprexa in the same way as "just about any type of [second-generation antipsychotic] medication." *Id.,* Ex. 4, at 78.

On April 23, 2001, Earl again met with Dr. Stone. They discussed concerns about perceived side effects of his Zyprexa regimen, including drowsiness and weight gain. *Id.,* Ex. 4, at 81. Dr. Stone recalled this consultation in some detail:

Q: [The progress note] says he continued to gain weight and sleeps late every day. Denies symptoms of illness. Says he would like to try Geodon to see if AE—I'm assuming that's adverse effects—

A (Dr. Stone): I think that's SE, side effects.

Q: Side effects. Okay. What is your understanding as to what this note means?

A: Well, he was taking some independence in his life. He was driving himself to his appointment. He was planning on going to college, visiting with friends, staying active socially. He was gaining weight and was sleeping late every day, 10 to 12 hours. He denied any symptom of his illness and said he wanted to try Geodon to see if it would help with the side effects. And I assume that means the weight gain and the drowsiness.

Q: Do you know how Mr. Earl would be aware of the availability of Geodon?

A: I have no idea. I would suspect the therapist may have mentioned it to him.

*Id.,* Ex. 4, at 81–82.

A few weeks later, at an appointment on May 7, 2001, Dr. Stone and Earl again met for a medical consultation. Dr. Stone described in his deposition testimony his decision to maintain Zyprexa treatment for Earl and the basis for that decision:

Q: How is Mr. Earl doing at this time?

A: Doing well. Planning on going to college for the summer quarter. Sleep and appetite were good. Denied side effects with meds other than weight gain. My objective findings were that he was doing well.

Q: And at that time, you decided to continue his Zyprexa?

A: Yes.

Q: So in your professional judgment at that time, the potential for weight gain was outweighed by the benefit that Mr. Earl was receiving from Zyprexa?

A: *That's a difficult question to answer. You have to be in that situation*

*at that moment. But I'm not sure that I was completely aware of the benefits versus the risks at that time.*

Q: Mr. Earl was—had been receiving—or had been well controlled on Zyprexa for some time . . .?

A: Symptomatically, he seemed to have been quite stable on the medication.

Q: *And you also in recent visits noted some weight gain, correct?*

A: *That's correct. But, again, lots of medications in psychiatry are associated with weight gain.*

Q: And what do you do typically when you have a patient that gains weight?

A: You encourage exercise. If [patients are] stable on the medication, you encourage exercise. *You also consider the potential for a change or reduction in dosage. You talk with the patient about the benefits of the medication. You try to discuss the risk, you know, depending on what you understand about the risks.*

Q: And at the—the outcome of that discussion with the patient [about] the risk or the benefits is the risk/benefit analysis . . . you make the prescription decision?

. . .

A: Yes.

*Id.,* Ex. 4, at 82–84 (emphasis added).

Not until September 27, 2004, more than six years after Earl's first Zyprexa prescription, is there evidence that Dr. Stone was aware of the scope and nature of Zyprexa's metabolic side effects. At that time, according to Dr. Stone, FDA and other disclosures about Zyprexa's diabetes-related risks had caused him to change his prescription, treatment, and monitoring practices for patients using or considering Zyprexa:

A: It was around this period of time that the warnings came out from the FDA regarding atypical antipsychotic medications and the need to monitor. At that time, as I recall we . . . were still trying to sort out what the monitoring criteria were. So on our best effort, *we were trying to get—to figure out whether or not people [like Earl] had a family history of diabetes, if they were at increased risk of developing diabetes or a heart disease, and also starting to monitor fasting blood sugars and lipid panels.*

Q: And so for that reason, you wanted those labs to be done [for Earl], fasting blood sugars and the lipid panel?

A: Yes.

Q: "Plan: Continue Zyprexa *and check endocrine studies.*"

A: Uh-huh.

Q: The endocrine studies are the fasting blood sugar and lipid panel?

A: That's correct.

Q: Then the final section [of the Physician Assessment/Treatment Form]: "Actions, risks, potential side effects, and alternatives were discussed. The patient voiced understanding and consent," and "yes" is checked.

A: Uh-huh.

Q: That would refer to?

A: That would refer to discussing with the patient the potential for side effects associated with this medication. And it would indicate that I talked with him about the potential for diabetes, for increased cholesterol, or problems or complications from hyperglycemia and increased lipids, along with the other side effects associated with the medication.

Q: And at that time, you decided to continue Zyprexa?

A: Yes.

*Id.,* Ex. 4, at 95–97 (emphasis added). This September 2004 appointment, soon

after Lilly sent out the March 2004 "Dear Doctor" letter, represents the earliest date on which Dr. Stone's demonstrated specific knowledge of Zyprexa's metabolic risks is indicated. Before that time, Dr. Stone's testimony and related medical records reveal only his awareness of the risk of weight gain associated with psychiatric drugs generally, including all second-generation antipsychotic drugs. *See, e.g., id.,* Ex. 4, at 78, 83. This physician's post-deposition affidavit is consistent with his testimony and related medical documentation insofar as it suggests a potential different course of treatment given an alternative warning by Lilly:

> During the period from the late 1990s until months prior to Kefrey Earl's death, *had I known that Zyprexa had a significantly greater risk of weight gain, insulin resistance, and diabetes,* than had been revealed by Eli Lilly, *I would have pursued other options for the treatment of Mr. Earl's psychotic symptoms,* including the use of other second generation antipsychotics or even first generation antipsychotics.

Aff. Timothy Stone, M.D. ¶ 3 (emphasis added).

Following the September 2004 consultation, Dr. Stone and other health care providers took steps to monitor Earl's metabolic processes. *See, e.g.,* Def. SUF, Ex. 4, at 100–01; Ex. 5, at EARL_0870, 0857, 1011; Ex. 8, at EARLK_EMH_0028. Zyprexa administration was continued. Less than ten months later, Earl was dead as a result of severe diabetic ketoacidosis.

### 3. Proposed Expert Testimony of Dr. David S.H. Bell

Dr. David S.H. Bell has been proffered as an expert witness by plaintiff. Dr. Bell has extensive training in the fields of internal medicine and endocrinology, considerable medical teaching experience, and professional experience that includes scholarly research and writing as well as clinical practice. *See* Curriculum Vitae, Dr. David S.H. Bell (Docket Entry No. 18–1).

In his report, Dr. Bell summarizes medical and scientific principles of diabetes, peer-reviewed research on Zyprexa's possible metabolic effects, and Earl's individual medical profile and history. Dr. Bell concludes that Zyprexa use caused Earl's diabetic condition and death:

> It is ... beyond a reasonable degree of medical certainty that the initiation of Zyprexa therapy in Kefrey's case caused the development of diabetes and his ensuing death from a diabetic coma.... [T]he cited medical literature shows documentation that the atypical anti-psychotics, particularly clozapine and olanzapine (Zyprexa), have been associated with weight gain, diabetes and altered lipid levels.

> Diabetes was never diagnosed before Kefrey's death. Evidence points to the fact that diabetes had developed most likely in the weeks or months before his death and had advanced to the point where it caused coma, brain damage and ultimately death.

> It is my opinion that Kefrey's diabetes and death would not have occurred if he had not been taking Zyprexa.

Bell Expert Report at 16 (Docket Entry No. 18–2). His expert report and deposition testimony suggest that Zyprexa caused diabetes through the weight gain it triggered for Earl as well as possible direct damage to Earl's pancreas and beta cells. *See generally* Bell Expert Report; *see also* Def. Ex. 2, Bell Dep. at 96–99, Mot. Hr'g, Aug. 26, 2009.

## IV. Law

### A. Expert Witness Qualification Requirements

Rule 702 of the Federal Rules of Evidence embodies the basic principles of

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It provides the framework for the present analysis:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

Determining the admissibility of expert testimony is a role assigned to the district court. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). A suitably thorough inquiry before reaching its determination is required. *Id.*

■ The analytical criteria required by Rule 702 include: (1) a "liberal standard of admissibility," *see Nimely v. City of New York,* 414 F.3d 381, 395–96 (2d Cir.2005); (2) necessary educational and experiential qualifications of the proposed expert warranting admissibility, *see Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995); (3) helpfulness to the jury, *see Daubert,* 509 U.S. at 591, 113 S.Ct. 2786; *United States v. Mulder,* 273 F.3d 91, 101–02 (2d Cir.2001), and relevance, *see* Fed.R.Evid. 401; (4) Rule 403 balancing to assess "whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice," *United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.1992); *Nimely,* 414 F.3d at 397; Fed.R.Evid. 403; and (5) reliability and scientific validity of the

proffered testimony, *see Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *Liriano v. Hobart Corp.,* 949 F.Supp. 171, 177 (S.D.N.Y. 1996).

■ In this longstanding and highly complex litigation, it is appropriate to place particular emphasis on the reliability and scientific validity of the expert's opinions. *See Souther,* 489 F.Supp.2d at 283 ("The most challenging and controversial gatekeeping role ... is that of ascertaining the reliability of proffered testimony, or 'whether the reasoning or methodology underlying the testimony is scientifically valid.'") (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). At this advanced stage of the *Zyprexa* litigation, with greater knowledge about the benefits and risks of antipsychotic drugs like Zyprexa within the scientific community, precision with respect to the relevant scientific knowledge and its application to the facts of individual cases is expected. An expert's testimony must employ the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167; *see also In re Zyprexa Prods. Liab. Litig.,* 04–MD–1596, 2009 WL 1357236, at *2–3 (E.D.N.Y. May 12, 2009).

■ As previously noted in this *Zyprexa* litigation, there must be evidence of "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." *Souther,* 489 F.Supp.2d at 284 (quoting *Nimely,* 414 F.3d at 397). The court must assess whether scientific principles and methods have been reliably applied by the proposed expert to the facts of the case. *Id.* An expert opinion based on insufficient facts, unsupported suppositions, or unreliable methodologies is not acceptable. *See* Fed. R.Evid. 702(1) and (2); *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256,

267 (2d Cir.2002) (trial court's *Daubert* analysis requires assessment of "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand").

### B. *Summary Judgment Standard*

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mitchell v. Washington-ville Central School District*, 190 F.3d 1, 5 (2d Cir.1999). Summary judgment is warranted when after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *see Anderson*, 477 U.S. at 247–50, 255, 106 S.Ct. 2505; *Sledge v. Kooi*, 556 F.3d 137, 140 (2d Cir.2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

### C. *Choice of Law*

■ A multidistrict litigation transferee court applies the choice of law and statute of limitations rules of the state in which the action was filed. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). Because this action was originally commenced in Alabama, the principles on choice of law from that state apply.

■ Alabama follows the rule of *lex loci delicti:* the court must determine the substantive rights of an injured party according to the law of the state where the alleged injury occurred. *Middleton v. Caterpillar Indus., Inc.*, 979 So.2d 53, 57 (Ala.2007); *Compass Bank v. Snow*, 823 So.2d 667, 675 (Ala.2001); *Fitts v. Minn. Mining & Mfg. Co.*, 581 So.2d 819, 820 (Ala.1991). Since the alleged injury and all other events relevant to this litigation occurred in Alabama, Alabama substantive law governs.

### D. *Alabama State Law*

Essential to the court's analysis on this motion for summary judgment is the "learned intermediary" doctrine, which provides (1) that manufacturers of prescription drugs and medical devices discharge their duty of care to patients by providing adequate warnings to prescribing physicians, and (2) that any failure to warn cannot be considered a proximate cause of a subsequent injury if the physician was fully aware of the dangers that would have been included in an alternative warning.

■ Alabama recognizes and applies the learned intermediary doctrine. *See Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313–14 (11th Cir.2000) (finding the learned intermediary doctrine applies under Alabama state law); *see also Spring-*

*hill Hospitals, Inc. v. Larrimore*, 5 So.3d 513, 518 (Ala.2008) (discussing application of the doctrine with respect to causation analysis and noting that "[i]t is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy") (quoting W. Keeton, R. Keeton & D. Owen, Prosser and Keeton on Torts § 96, at 688 (5th ed. 1984)). The doctrine reflects the basic principle of tort law that a plaintiff must establish that the alleged inadequate warning proximately caused the claimed injury. *See Campbell v. Robert Bosch Power Tool Corp.*, 795 F.Supp. 1093, 1097 (M.D.Ala. 1992); *Gurley v. Am. Honda Motor Co., Inc.*, 505 So.2d 358, 361 (Ala.1987) (citing *E.R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963, 970–71 (Ala.1985)).

The learned intermediary defense is an "aspect of proportionality that shifts at least some of the burden of protecting patients from pharmaceutical manufacturers to treating physicians.... [T]he learned intermediary rule cannot be viewed as an all-or-nothing regulation that absolves the manufacturer, shifting the onus entirely to the treating physician, but its force in ameliorating liability for damages of the manufacturers cannot be ignored." *Souther*, 489 F.Supp.2d at 244.

There is a strong trend in prescription drug failure-to-warn cases to reiterate and apply this well established doctrine. *See, e.g., Motus v. Pfizer Inc.*, 358 F.3d 659, 661 (9th Cir.2004) (holding that a product defect claim based on insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician) (citing *Plummer v. Lederle Laboratories, Div. of American Cyanamid Co.*, 819 F.2d 349, 358–59 (2d Cir.1987)); *Ebel v. Eli Lilly & Co.*, 536 F.Supp.2d 767 (S.D.Tex. 2008) (granting summary judgment for de-

fendant upon finding that prescribing physician was aware of Zyprexa's suicide-related risks that an adequate warning would have provided and that plaintiff had presented no evidence physician would not have prescribed Zyprexa had defendant provided him with an alternate warning label), *aff'd*, 321 Fed.Appx. 350 (5th Cir. 2009); *Allgood v. GlaxoSmithKline PLC*, No. 06–3506, 2008 WL 483574, at *3 (E.D.La. Feb. 20, 2008) (granting summary judgment for defendant because plaintiff had failed to show (1) that defendant did not adequately warn the physician of a risk associated with the drug that was not otherwise known to the physician and (2) that the "failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury"), *aff'd sub nom. Allgood v. SmithKline Beecham Corp.*, 314 Fed.Appx. 701 (5th Cir.2009).

## V. Application of Law to Facts

### A. Motion to Exclude Proffered Expert

The admissibility of expert testimony in this multidistrict litigation has been discussed extensively. *See Souther*, 489 F.Supp.2d at 281–85; *In re Zyprexa Prods. Liab. Litig.*, 04–MD–1596, 2009 WL 1357236 (E.D.N.Y. May 12, 2009). The court has emphasized the flexible analysis required in ruling on expert challenges, with the ultimate goal of assuring that proffered expert testimony meets scientific standards and is relevant and reliable. *See Souther*, 489 F.Supp.2d at 282 (citing *Daubert*).

■ Generally, the question of veracity and weight of the proposed opinion should be left to the jury where, as here, the proposed expert has sufficient paper credentials indicating Board certification in internal medicine and subspecialty certification in endocrinology, with clinical experience, medical teaching and a number of scholarly publications. *See* Fed.R.Evid.

702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion"). *see also generally* Note, Admitting Doubt: A New Standard for Scientific Evidence, 123 Harv. L. Rev. 2021 (2010). Dr. Bell meets the necessary educational and experiential qualifications warranting admissibility of his expert testimony on the relevant principles of endocrinology and the causal relationship between Earl's Zyprexa use and the onset of diabetes.

Upon review of Dr. Bell's expert report, *see* App. 2, and deposition testimony, *see* Def. Mot. Exclude, Ex. 3, the court finds that Dr. Bell has demonstrated a sufficient "precision with respect to the relevant scientific knowledge and its application to the facts" of the individual case. *See In re Zyprexa Prods. Liab. Litig.*, 04–MD–1596, 2009 WL 1357236, at *2. His written and testimonial discussions of Earl's medical, psychiatric, and related histories demonstrate a careful review of the deceased's profile. His conclusions on general causation are based considerably on peer-reviewed, well-known epidemiological studies and other permissible sources of information. *Id.* at *3; *In re Human Tissue Prod. Liab. Litig.*, 582 F.Supp.2d 644, 660 (D.N.J.2008). His opinion on specific causation is based on a thorough analysis of Earl's distinctive individual background and the controlling scientific principles relevant to determinations of both general and specific causation in the instant case. Lilly's argument against the validity of Dr. Bell's thesis on Zyprexa's *direct* damage to the pancreas and beta cells is compelling, but it is not decisive and need not be evaluated on the present motion. Paramount to the case is whether Earl's diabetes was caused by Zyprexa through the *indirect* instrumentality of weight gain. Dr. Bell's opinion on the etiology of diabetes with respect to weight gain—a generally accepted causal relationship—satisfies *Daubert* requirements: it may be helpful to a jury, *see Daubert*, 509 U.S. at 591, 113 S.Ct. 2786; *Mulder*, 273 F.3d at 101–02, and possesses sufficient indicia of reliability and scientific validity, *see Daubert*, 509 U.S. at 592, 113 S.Ct. 2786.

Absent persuasive grounds for excluding the testimony of Dr. Bell, and given the jury's constitutional role to weigh the evidence, including appropriate expert opinion testimony, a finding of admissibility is warranted. *See Souther*, 489 F.Supp.2d at 285 (citing *Jakobetz*, 955 F.2d at 797).

The motion to disqualify Dr. David S.H. Bell as an expert is denied.

### B. *Proximate Causation*

The record provides no evidence about the knowledge of the physicians or medical team responsible for the initial decisions to prescribe Zyprexa to Earl. Zyprexa was administered for approximately one month by Dr. Park following Earl's February 1997 involuntary commitment at UAB Hospital. The following year, Dr. Munoz restarted Zyprexa treatment after Earl was again involuntarily committed to UAB Hospital for "acute exacerbation of paranoid schizophrenia." Zyprexa treatment was then maintained. Dr. Stone began to provide care to Earl in May 1998, a relationship that continued until Earl's death in July 2005. Despite periods of non-compliance with the Zyprexa regimen in 1998 and 1999, most Zyprexa use and documented weight gain occurred under the care of Dr. Stone. The evidence relating to Dr. Stone's knowledge of Zyprexa's metabolic risks and prescribing decisions with respect to Earl substantially informs the learned intermediary analysis that is central to Lilly's instant motion for summary judgment.

■ Based on the medical records and testimonial statements of Dr. Stone, there is an issue of material fact—whether he was aware of the nature and scope of Zyprexa's metabolic risks during the more

than six years he treated Earl. His testimony indicates that both he and Earl were aware of the significant weight gain Earl experienced during the course of Zyprexa administration. Dr. Stone acknowledged some awareness of weight gain as a possible side effect of psychiatric drugs generally during the early years of Earl's treatment. Yet, he emphasizes his uncertainty as to whether he "was completely aware of [Zyprexa's] benefits versus the risks at that time." Def. SUF, Ex. 4, at 83.

The medical documentation supports the claim that this responsible physician did not have sufficient knowledge of the specific risks that plaintiff argues should have been included in an alternative warning. It was not until September 27, 2004 that a medical report indicated that Dr. Stone knew of, and discussed with his patient, Zyprexa's potential metabolic side effects, including weight gain and diabetes, and took steps to conduct monitoring and consider other treatment options. Significantly, the critical understanding was documented soon after physicians were notified about the scope and nature of Zyprexa's metabolic side effects in Lilly's 2004 "Dear Doctor" letter. *Id.*, Ex. 4, at 95–97.

Dr. Stone reiterated his belief that he would have pursued a different treatment course with Earl had there been an alternative Lilly warning prior to 2004. In his post-deposition affidavit, he states: *"[H]ad I known that Zyprexa had a significantly greater risk of weight gain, insulin resistance, and diabetes, than had been revealed by Eli Lilly, I would have pursued other options* for the treatment of Mr. Earl's psychotic symptoms." Aff. Timothy Stone, M.D. ¶ 3 (emphasis added).

Post-deposition sworn statements which have not been subjected to cross-examination are of limited persuasive effect for purposes of a motion for summary judgment. *See, e.g., Singer v. Eli Lilly & Co.,* 06–CV–1338, 2009 WL 1404978, at *14 (E.D.N.Y. May 19, 2009). "A party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States,* 814 F.2d 120, 124–25 (2d Cir.1987) (citing *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969)); *see also Sears v. PHP of Ala., Inc.,* 05–CV–304, 2006 WL 932044, at *11 (M.D.Ala. Apr. 10, 2006) (noting "the general view of courts that deposition testimony is more reliable than affidavit testimony, given that the testimony of the deponent generally has been scrutinized through cross-examination").

The affidavit of Dr. Stone is distinguishable from that of the proposed expert in *Singer:* Dr. Stone at no point contradicts his deposition testimony, but instead reinforces the statements he had already made in responding to Lilly's counsel's hostile direct examination.

The evidence demonstrates that a reasonable juror could find that, given an earlier alternative warning from Lilly, Dr. Stone would have made different treatment decisions with respect to Earl, including an altered prescription choice or additional monitoring. The alleged inadequacy of the Zyprexa warning related to metabolic risks, a jury might conclude, may have led to treatment decisions that contributed to Earl's subsequent injuries, including diabetes and death. Summary judgment in favor of defendant is not warranted.

### C. *Motion to Remand*

Plaintiff has moved to remand this diversity case to the court of original jurisdiction. The motion is premature. At the conclusion of discovery and pre-trial motion practice, remand may be considered by this court.

## VI. Conclusion

The exclusion of plaintiff's proposed expert is denied. Summary judgment against the plaintiff is denied.

SO ORDERED.